1
2
3
4
5
6

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

7   UNITED STATES OF AMERICA,                )
                                             )   Case No. 2:06-cr-00091-RLH-PAL
8                           Plaintiff,       )
                                             )   **REPORT OF FINDINGS AND**
9   vs.                                      )   **RECOMMENDATION**
                                             )
10                                           )   (M/Dismiss - #56)
                                             )
11  FADI B. CHAIBAN, et al.,                 )
                                             )   **AND ORDER**
12                           Defendants.     )
    _____)   (M/Evidentiary Ruling - #70)
                                                 (M/Withdraw - #73)
13

14          Before the court is defendant Fadi Chaiban's ("Chaiban") Motion to Dismiss Indictment Based

15   on the Violation of the Sixth Amendment (#56), filed October 9, 2006, which was referred to the

16   undersigned for findings and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and LR IB 1-4.

17   The court has considered the motion; the government's Response (#59), filed October 23, 2006; the

18   defendant's Evidentiary Objection to Declaration of Karyn Kenny (#60) and a Reply (#61), both filed

19   October 26, 2006; the government's Supplemental Response (#62), filed October 26, 2006; the

20   defendant's Reply to Supplemental Opposition (#64), filed October 31, 2006; the government's Second

21   Supplemental Response (#74), filed November 9, 2006; the government's Memorandum in Support of

22   Its Response to Defendant's Motion to Dismiss (#80), filed November 21, 2006; the defendant's

23   Declaration of Fadi Chaiban (#82), filed November 28, 2006; and the government's Response to

24   Chaiban's Declaration (#86), filed December 4, 2006.  In addition, the court conducted a series of

25   evidentiary hearings on October 30, November 13, November 15, November 17 and November 22,

26   2006 (See Minutes, ## 63, 76, 77, 81, 84).  At the hearings the defendant was represented by Lawrence

27   Litman.  The government was represented by Daniel Schiess.  Also before the court are the

28   / / /

1 | government's Motion for Evidentiary Ruling (#70) and Motion to Withdraw the Motion for Evidentiary

2 | Ruling (#73), both of which were filed November 9, 2006.

3 | **BACKGROUND**

4 | Chaiban is charged in a second superseding indictment (#49) returned August 16, 2006 with six

5 | counts of False Use of Social Security Number, five counts of Aggravated Identity Theft, two counts of

6 | Transportation of a Female for Prostitution, Conspiracy, Obstruction of Justice, and Aiding and

7 | Abetting.  The indictment also includes forfeiture allegations.  The charges arise out of an investigation

8 | by the Las Vegas Metropolitan Police Department ("LVMPD") into Chaiban's alleged operation of an

9 | interstate prostitution ring that he ran out of his home in Las Vegas.

10 | **I.    Motion to Dismiss**

11 | Chaiban's motion seeks dismissal of the Second Superseding Indictment (#49) based upon

12 | violation of his Sixth Amendment rights resulting from his allegations that investigators monitored

13 | and/or listened to recordings of telephone conversations he had with attorney Janalee Murray

14 | ("Murray") while detained in the Clark County Detention Center ("CCDC") and North Las Vegas

15 | Detention Center ("NLVDC").  Chaiban contends that Murray was acting as his attorney during the

16 | course of these phone conversations, and therefore the contents of the conversations are protected by

17 | the attorney-client privilege.  (Mot. at ¶¶ 8, 10.)  Although Murray is not Chaiban's counsel of record in

18 | this case, he describes her as his "long time attorney," who is currently representing him in a federal

19 | court case involving his immigration matters.  (Id. at ¶8.)  (The court docket reflects Janalee Murray is

20 | Chaiban's attorney of record in a petition for review of an immigration removal under case no.

21 | 2:03-cv-01414-PMP-RJJ which has been transferred to the Ninth Circuit pursuant to the provisions of

22 | the REAL ID Act of 2005, Pub. L. No. 109-13, 119 Stat. 236.)

23 | Chaiban alleges that LVMPD Detective Joe Kelley ("Kelley") obtained copies of audio

24 | recordings of all the phone conversations Chaiban had while detained in CCDC and NLVDC without a

25 | subpoena or court order.  (Id. at ¶10.)  He contends that those audio recordings included 47

26 | conversations he had with Murray, of which 35 contained privileged information ("the Murray calls").

27 | (Id.)  He further alleges that investigators and federal prosecutors listened to, analyzed and transcribed

28 | the recordings, including the Murray calls.  (Id. at ¶11.)  He received the transcripts and audio

2

1   recordings and believes that they were also disseminated to members of the U.S. Attorney's office

2   prosecution team, LVMPD investigators working on his case and co-defendant Erin Graham

3   ("Graham") and her counsel, Thomas Fagerberg ("Fagerberg").  (Id.)

4        Counsel for Chaiban, Lawrence Litman ("Litman"), raised the issue of a breach of the attorney-

5   client privilege with the United States Attorney's office before filing the motion.  (Id. at ¶14.)

6   Chaiban's counsel states that he was told that a separate "taint agent" and "taint attorney," neither of

7   whom were members of the team of investigators and prosecutors working on this case, were appointed

8   to listen to the Murray calls, and determined that Chaiban's rights had not been violated.  (Id.)  He

9   alleges, however, that through various means the substance of his conversations with Murray was

10   conveyed to investigators and prosecutors working directly on his case, including Detective Kelley,

11   Assistant U.S. Attorney ("AUSA") Karyn Kenny ("Kenny"), and AUSA Daniel Schiess ("Schiess").

12   (Id. at ¶16, 25:10-26:22.)

13        Chaiban further alleges that having learned the substance of his communications with Murray,

14   Kenny and Kelley used the information in violation of his Sixth Amendment right to counsel.  (Id. at

15   26:6-28:23.)  Chaiban contends that their use of privileged information in the Murray calls has

16   prejudiced his ability to have a fair trial.  Specifically, he alleges:

17            1.     Kenny used the information she learned from the Murray calls to

18                     add new and additional charges in the first and second

19                     superseding indictments.

20            2.     Kenny disseminated copies of audio recordings of the Murray

21                     calls to him and various members of the investigation and

22                     prosecution teams, and instructed Fagerberg to obtain discovery

23                     from Litman with knowledge that the discovery contained the

24                     audio recordings of the Murray calls.

25            3.     The government decided to use co-defendant Graham as a witness

26                     against Chaiban after listening to the contents of the Murray calls.

27            4.     The government learned of Chaiban's ex-girlfriend Lisa

28                     Hutchinson ("Hutchinson") and her involvement with the

websites Chaiban was operating from listening to the Murray calls.  Kelley then located Hutchinson, conducted an interview with her, and obtained her laptop which contained incriminating information.

5.    The government sought forfeiture of Chaiban's Hummer vehicle and used it as a basis for the Second Superseding Indictment's money laundering charge based upon information learned from listening to the Murray calls.

6.    The government used information learned from the Murray calls to correct problems in the First Superseding Indictment regarding the statute of limitations.

7.    The government learned of defense strategy, specifically, the defendant's strategy with regard to each of the charges, challenges to the search warrant, medical concerns at the prison, sentencing, plea negotiations, accusations of prosecutorial misconduct, and the work of the investigators in the case.

## II.    Parties' Arguments

Chaiban argues that monitoring attorney-client conversations is only permitted when a judge issues a warrant upon a finding of probable cause, or upon reasonable suspicion the communications are used to facilitate acts of terrorism, and that Kelley did not seek or obtain a warrant permitting him to obtain attorney-client privileged phone calls.  Chaiban contends that such monitoring also violates Bureau of Prisons regulations regarding inmate telephone communications, found at 28 C.F.R. § 501.3(d)(3).  Furthermore, he asserts that once the U.S. Attorney's office became aware that Kelley had obtained and/or listened to audio recordings of the Murray calls, it should have sought judicial intervention.  Instead, Chaiban alleges that prosecutors listened to, transcribed, and analyzed the Murray calls, and distributed them through discovery to co-defendant Graham's counsel.  Chaiban contends that the disclosure of his attorney-client privileged conversations has prejudiced his ability to have a fair

/ / /

4

1  trial as a result of the specific activities listed *supra*, along with the disclosure of defense strategy, in

2  violation of his Sixth Amendment right to counsel.

3       Acknowledging that under the Supreme Court's holding in <u>Weatherford v. Bursey</u>, 429 U.S. 545

4  (1977) he must show "substantial prejudice," Chaiban asserts that any one of the six specific

5  disclosures of incriminating information in the Murray calls he has identified, coupled with the

6  government's use of that information to gain an advantage in the investigation and prosecution of his

7  case, establishes substantial prejudice and requires dismissal of the second superseding indictment

8  against him.  In addition, he argues he has shown substantial prejudice resulting from the government's

9  acquisition of defense strategy under the Ninth Circuit's burden-shifting analysis in <u>U.S. v. Danielson</u>,

10  325 F.3d 1054 (9th Cir. 2003).  He contends that the activities of Kelley and Kenny demonstrate a

11  *prima facie* showing of intentional intrusion into the attorney-client relationship through the acquisition

12  of privileged materials.  Moreover, he contends that recording attorney-client conversations inhibit a

13  client and counsel from open and honest communication and, therefore, intrudes upon the attorney-

14  client relationship, even if the government does not listen to the conversations.  Having established the

15  government recorded attorney-client conversations, Chaiban argues that the government now bears the

16  burden of showing beyond a reasonable doubt that no prejudice resulted from its intentional intrusion.

17  Finally, Chaiban asserts that the only appropriate remedy for the government's Sixth Amendment

18  violation is dismissal of the indictment against him because the government's activities have been so

19  prejudicial that they have impaired his ability to mount a defense at trial.

20       The government's initial response denied each of Chaiban's allegations.  It asserted that

21  Chaiban was well aware that calls he placed while detained at CCDC were monitored and/or recorded,

22  except for calls to an attorney.  (Resp. at 4:3-6.)  The government indicated that Chaiban identified John

23  Momet (sic) and Thomas Pitaro as his attorneys to CCDC, but not Murray.  (<u>Id.</u> at 4:6-7, Ex. "B.")  The

24  government explained that Kelley obtained a list of phone numbers from co-defendant Graham's

25  cellular telephone that he used to request audio recordings of Chaiban's calls made from CCDC.  (<u>Id.</u> at

26  4:16-19.)  It further explained that on March 13, 2006, Kelley listened to calls placed between March 8

27  and March 12, 2006, one of which was a call to Murray.  (<u>Id.</u> at 4:20-24.)  The government indicated

28  that Kelley was not aware that one of the calls was to Murray because she did not identify herself by

1    name during the conversation, and Kelley had not yet received subscriber information that identified

2    Murray as the source of the phone call until April 3, 2006.  (Id. at 4:24-5:9.)  When Kelley learned that

3    Murray was an attorney, he sought Kenny's advice.  (Id. at 5:11-14.)  Kenny and Kelley believed that

4    Murray was aiding and abetting Chaiban in his prostitution ring, rather than acting as his attorney.  (Id.

5    at 5:14-16.)  Nevertheless, Kenny told Kelley not to listen to any of the Murray calls, and set up a taint

6    procedure by which a separate investigator and AUSA would review calls between Chaiban and Murray

7    and prepare summaries of the calls.  (Id. at 5:17-6:15.)  Neither Kenny nor Kelley listened to the audio

8    recordings or reviewed the summaries.  However, the recordings and summaries of the recordings were

9    provided to counsel for Chaiban in discovery.  (Id. at 6:16-24.)

10          The government argues that based upon evidence discovered by Kelley during the course

11   of the investigation, the government had reason to believe that Murray was not acting as Chaiban's

12   attorney, but was instead aiding and abetting his prostitution ring.  (Id. at 7:1-23.)  Therefore, the

13   purpose of the government's taint team was to determine whether Murray was a co-conspirator and

14   not to invade Chaiban's right to confidential communication with his attorney.  (Id.)  The government

15   dismisses Chaiban's claims of prejudice as "mere conjecture" and argues that Kenny and Kelley

16   did not listen to the Murray calls; the taint procedure was set up to avoid the possibility of violating

17   Chaiban's Sixth Amendment rights, not to invade his right to counsel; and every step in the

18   investigation and prosecution resulted from independent investigation, not the contents of the Murray

19   calls.  (Id. at 8:1-10:2.)  The government contends that it did not violate Chaiban's Sixth Amendment

20   rights because the prosecutors and investigators involved in this prosecution did not listen to the tapes

21   or learn of their contents from the taint team.  (Id. at 10:4-9.)  The government further argues that the

22   Murray calls were not privileged because Chaiban was aware that those conversations were being

23   recorded.  (Id. at 10:10-18.)  At oral argument, and in supplemental papers, the government suggested

24   that the court should find that Chaiban waived his attorney-client privilege by speaking to Murray on a

25   telephone he knew was being monitored and/or recorded, and not reach Chaiban's Sixth Amendment

26   interference and prejudice arguments.  Finally, the government argues that the Bureau of Prisons

27   regulations Chaiban cited do not apply to federal inmates housed in pretrial detention facilities such as

28   CCDC and NLVDC that are not operated by the federal government.  (Id. at 10:19-26.)  Alternatively,

1   the government asserts that even if those regulations did apply to Chaiban's situation, a violation of

2   those regulations does not automatically constitute a Sixth Amendment violation.

3          In his Reply, Chaiban denies that he was given the CCDC Intake Form attached as Exhibit "A"

4   to the government's response and points out that the form states that phone calls were subject to

5   monitoring and recording, "with the exception of calls placed to your attorney." (Repl. at 2:2-12.)  He

6   also argues that Kelley is disingenuous in stating that he did not learn that Murray was Chaiban's

7   attorney until he received subscriber information on April 6, 2006 because Kelley found documents

8   during the search of Chaiban's home indicating that Murray had previously been Chaiban's attorney of

9   record prior to the time Kelley obtained audio recordings.  (Id. at 2:13-3:12.)  Chaiban contends that the

10  court should analyze the prosecutors' activities as it would an attorney "overhearing" conversations

11  between a lawyer and client at trial in which prosecutors are required to seek judicial intervention.  (Id.

12  at 4:20-5:19.)  Furthermore, he indicates that AUSAs are required by the U.S. Attorney's Criminal

13  Resource Manual to report such overhearings to the court.  (Id.)  Finally, he argues that the

14  government's monitoring and/or recording of Chaiban's calls to Murray violated both federal and state

15  laws against wiretapping.  (Id. at 12-15.)

16         Both sides submitted several supplemental responses in which they argued whether Chaiban had

17  waived the attorney-client privilege.  At the evidentiary hearing, the defendant called 12 witnesses, and

18  the government recalled two defense witnesses.

19  **III.    The Evidentiary Hearing**

20  **Sergeant Richard Forbus**

21         Sgt. Richard Forbus ("Forbus") works for the LVMPD intelligence unit at CCDC where he

22  works with the inmate telephone system.  When an inmate is booked into CCDC, he is given a form

23  indicating that all phone calls are monitored and/or recorded except for what are termed "legal

24  recordings."  Forbus indicated that this form, a Detention Services Division Intake Pre-Classification

25  Questionnaire, which was marked and admitted as Government's Exhibit "A," was available when

26  Chaiban was booked into CCDC.  However, although the interviewing officer inserted her personnel

27  number and date, the line for an inmate's signature states "unable."  Forbus explained that while he was

28  not familiar with Chaiban's booking, the term "unable" is used when there is a language barrier or

1   medical problem preventing the inmate from signing the form.  Based on his knowledge of CCDC

2   procedures, he concluded from reviewing Chaiban's intake pre-classification questionnaire that the

3   questionnaire was not filled out with him.  Forbus explained that inmates at CCDC are provided

4   numerous notices about the monitoring and/or recording of phone calls beyond the intake form.  These

5   notices include an audio recording played both when the inmate dials and when the call connects stating

6   that all calls are monitored and/or recorded.  In addition, signs on the wall near the phones, on the

7   phones, and in the booking area repeat this message.

8         Forbus said that calls to or from attorneys are treated by CCDC no differently than non-attorney

9   calls.  However, CCDC's telephone provider, EverComm, provides a procedure for attorneys to register

10  their phone numbers with the company to block calls with their inmate clients.  Blocked calls are not

11  recorded.  Requests to block attorney calls generally come from an attorney, and are verified by

12  EverComm.  Not all attorneys have registered with EverComm.

13        On cross-examination, Forbus explained that due to the volume of calls, he and his staff rarely

14  monitor calls except where potential violence within CCDC is suspected.  Forbus does not have the

15  staff to monitor calls on behalf of law enforcement agencies, but provides them inmate recordings upon

16  request.  Detective Kelley made a request for calls placed by Chaiban.  On occasion, Forbus has

17  inadvertently overheard attorney calls, but has terminated monitoring for fear of intruding upon the

18  attorney-client privilege.  He did not listen to the Murray calls.

19  **Detective Joe Kelley**

20  _____Kelley has worked as a detective with LVMPD's criminal intelligence section for almost 18

21  years.  He was assigned the Chaiban investigation in December, 2005.  Kelley was contacted by United

22  States Immigration and Customs Enforcement ("ICE") concerning Chaiban's possible role in child

23  prostitution and use of narcotics.  Kelley learned that Chaiban's former associates Lisa Hutchinson

24  ("Hutchinson") and Edward Pangellian ("Pangellian") had gone to ICE with information about

25  Chaiban's activities.  ICE helped Kelley locate these two individuals so that Kelley could interview

26  them.

27        Kelley first met Hutchinson on December 13, 2005, and continued to meet with her on a

28  monthly basis.  Kelley learned that Hutchinson had worked for Chaiban in the past as a prostitute, and

had also helped him run his prostitution business with the aid of a specially-configured computer program based on Microsoft Outlook.  Hutchinson had the computer program on her laptop and showed it to Kelley during their initial and subsequent meetings.  Kelley took photos of computer screens displaying Chaiban's program, and text messages, but left the computer with Hutchinson because it was her personal computer and because LVMPD's Cybercrime Unit did not have time to image the hard drive until months later.

Kelley had also learned of Chaiban's activities from reviewing websites Chaiban had created to run his prostitution business which were linked to Chaiban through subscriber identification and through phone numbers listed on the websites.  Additionally, prostitutes who had previously worked for Chaiban came to the police when Chaiban stopped giving them a cut of the business.  Chaiban had been using this money to register more websites and to purchase a Hummer vehicle.  Kelley learned from Pangellian about how Chaiban recruited transsexuals into the prostitution ring through threats. Pangellian had once worked for Chaiban under the name "Duchess."

Kelley learned that Chaiban had assumed the identity of "Miguel Medina" and had registered vehicles and obtained a driver's license in that name.  This information was corroborated by investigators with the Social Security Administration ("SSA").  Chaiban had also created businesses using this identity.

Kelley first learned of Murray from Hutchinson during a meeting in January, 2006.  Hutchinson told Kelley that Murray had represented Chaiban in immigration matters and that the two had had a romantic relationship.  Hutchinson also said that Murray had given Chaiban advice on how to avoid having his prostitution business detected by law enforcement, and specifically how to avoid prosecution under the RICO statute.

Using this information, Kelley sought and obtained a search warrant for Chaiban's residence. The search warrant was executed on March 8, 2006.  The March 8, 2006 search was the only one conducted at Chaiban's residence.  Kelley was the first to arrive at the residence.  SSA agents Kidwell and Warren arrived 15 minutes later with Chaiban.  During the search warrant execution, Kelley confirmed that Murray had a romantic relationship with Chaiban, and that she was a possible co-conspirator.  Kelley discovered records indicating that Chaiban had used Murray's credit card to pay for

1   the websites.  Murray's credit card statement was discovered on a desk in the residence along with

2   Murray's bank statement.  Kelley also discovered a bill from Murray for immigration work in a closet.

3   The bill had written on it "paid in full" for "dinner, dancing and friendship forever," along with a zero

4   dollar balance.  The bill was found along with older immigration legal bills.  He also recovered a letter

5   from Murray to Chaiban indicating she was upset that Chaiban had not returned her phone calls which

6   made her call their relationship into question.  Chaiban assisted in this search and was later booked on

7   an outstanding state warrant for identity theft.

8       Kelley did not learn where Murray was employed until after March 8, 2006 when he listened to

9   an audio recording of a phone conversation between Chaiban and his co-defendant Graham.  Kelley

10   learned from listening to a conversation between Chaiban and Graham that Murray is a deputy district

11   attorney in Battle Creek, Nevada.

12       Kelley acknowledged that the original federal indictment only contained one count of false use

13   of a Social Security number. When Chaiban appeared at his initial appearance in federal court on the

14   original indictment Kelley had a significant amount of information about Chaiban's prostitution

15   business and knew that Chaiban had taken prostitutes across state lines.  Kelley needed the information

16   from Hutchinson's computer, however, to support charges of money laundering and violations of the

17   Mann Act.  To obtain information from Hutchinson's computer, Kelley needed the assistance of

18   LVMPD's Cybercrime Unit, which had a significant backlog that prevented it from imagining and

19   analyzing the information prior to the time of the original indictment.

20       The March 8, 2006 search warrant also authorized Kelley to obtain subscriber identification for

21   a series of phone numbers Kelley had obtained from Graham's personal cellular phone.  Kelley cross-

22   referenced these phone numbers with phone numbers he discovered during the search of Chaiban's

23   residence.  Having obtained this list of numbers, Kelley requested that CCDC run the list to determine

24   if Chaiban had placed calls to any of these numbers while housed at CCDC where he was initially

25   booked on the outstanding state warrant.  Chaiban was transferred to federal custody on March 23,

26   2006, and detained in NLVDC.

27   / / /

28   / / /

### A.    CCDC Recordings

Kelley made three requests for audio recordings of phone calls placed by Chaiban while he was housed at CCDC, and listened to each of them.  Kelley explained that CCDC records telephone calls placed from CCDC.  The telephones play a "preamble" which notifies the caller and the recipient that the call may be monitored and/or recorded.  If the recipient wishes to accept the call, he or she presses the "0" key on the phone.  He made the first request on March 12, 2006 for calls placed from the time of Chaiban's arrest until that date.  Kelley received the recordings the next day.  There were approximately 40 recordings.  At the time, Kelley was not aware any of the calls were to Murray.  On March 27, 2006, Kelley made a second request for audio recordings to cover the period from March 13 to March 23, 2006.  He received the audio recordings that same day.  Kelley made a third request on April 18, 2006 for the period from March 8 to March 23, 2006.  Although it was for the same period of time as the first two requests, Kelley explained that this request was much broader because it included additional phone numbers.  Kelley would later learn that one of the additional phone numbers he requested was Murray's phone number.

On March 16, 2006, Kelley served an administrative subpoena on the phone company seeking subscriber identification for the phone numbers from the first set of audio recordings obtained March 12, 2006.  The phone company responded to the administrative subpoena on April 3, 2006, and Kelley learned for the first time one of the calls Chaiban placed from CCDC on March 9, 2006 was to Murray.  That call lasted three minutes.  Kelley did not recall Murray identifying herself during the call.  Kelley also learned that one of the calls in the second set of phone requests was to Murray, but to his knowledge that call did not connect.

When Kelley learned he had overhead a call from Chaiban to Murray, he immediately contacted Kenny, because he was afraid he might have violated the attorney-client privilege.  Kenny told Kelley not to listen to any further audio recordings involving Murray.  Kelley met with Kenny and Schiess because he believed that there would be future calls to Murray.  Kelley also contacted Clark County Assistant District Attorney Chris Lalli ("Lalli") to learn whether Murray's status as a deputy district attorney precluded her from representing Chaiban.  Lalli advised Kelley that Murray could represent Chaiban in immigration matters, but not in a criminal case.

**B.    NLVDC Recordings**

Kelley made a request on May 18, 2006 for calls from NLVDC for the period of March 31 to May 18, 2006.  He received a response from NLVDC the same day.  He gave NLVDC six phone numbers which produced "hits" for three phone numbers.  Those three phone numbers were for Murray's cellular phone, Murray's home phone, and Chaiban's mother's home phone in San Diego, California.  Kelley listened to the 97 calls to Chaiban's mother's home in San Diego.  However, Kelley did not listen to any Chaiban's calls to either of Murray's phone numbers.  Co-defendant Graham was staying with Chaiban's mother.

Kelley gave the audio recordings of Chaiban's calls to Murray to Detective Hamblin ("Hamblin") who worked in Kelley's department.  Hamblin received all of the Murray calls Kelley received from CCDC on April 18, 2006 on a single CD in late May, 2006.  Kelley gave Hamblin a copy of the Chaiban/Murray calls from NLVDC he received on May 18, 2006 on a second single CD in July, 2006.  Kelley's instructions to Hamblin were to focus on the use of Murray's credit card to determine if she was a co-conspirator in Chaiban's prostitution business.  Hamblin prepared summaries of the audio recordings.  Kelley received, but did not review the summaries.  These summaries were provided to defense counsel, Mr. Litman, as part of discovery in the case.

Kelley placed Hamblin's first summary in a large computer paper box along with a myriad of other discovery documents.  Kelley gave the box to Kenny's assistant with the instructions that copies were not necessary, and she should bate stamp and deliver the contents to Mr. Litman.  Kelley received the summary of the second CD from Hamblin in late July.  It was not protected with a cover sheet, but he did not read it.  Kelley put the second summary in another large box of discovery materials, which was given to Kenny's assistant with the same instructions to bate stamp and deliver them to Litman.

Kelley spoke in generalities to Hamblin about the Murray recordings and Hamblin said they were "95% love talk" and 5% "other."  Hamblin did not tell Kelley about any legal discussion Murray and Chaiban may have had.  A second meeting was organized at the U.S. Attorney's office to discuss Chaiban's use of Murray's credit card and whether the credit card could be used to link Murray to Chaiban's criminal activity.  In attendance were Hamblin, Kelley, Kenny, SSA Agent Kidwell, an agent

/ / /

12

1   from the Internal Revenue Service ("IRS"), and an agent from ICE.  They did not discuss any legal

2   matters Hamblin overheard during his review of the Chaiban/Murray calls.

3        NLVDC also records telephone calls made by inmates.  Kelley learned that NLVDC does not

4   post signs on the walls and phone as CCDC does; instead, NLVDC has an audio warning at the start of

5   all phone calls.  NLVDC also uses a procedure similar to CCDC's which allows attorneys to block their

6   calls, and prevent recordings of calls with their inmate clients.  Kelley did not listen to any

7   Chaiban/Murray calls placed from NLVDC.  Hamblin did not tell Kelley about the contents of any such

8   calls.

9        On cross-examination, Kelley said he knew of Murray prior to March 8, 2006 from the ICE

10  agents.  He also learned she was an attorney from searching Chaiban's residence when he recovered

11  motions filed in court and legal bills.  Kelley did not know that Murray was Chaiban's immigration

12  attorney until February or March when Kenny asked that Chaiban's "A-file" be included in the criminal

13  file.  Kelley did not discuss with Kenny the possibility that Chaiban's conversations with Murray were

14  protected by the attorney-client privilege.  Instead, they talked about whether Murray was a co-

15  conspirator.  Kelley did not believe that Chaiban considered Murray his attorney of record based on his

16  listening to a series of jail phone calls between Chaiban and Graham.  In the first call on March 9, 2006,

17  Graham asked Chaiban if she should contact Murray.  Chaiban said: "No, she's stupid."  During a

18  March 20, 2006 call, Chaiban told Graham that Murray was a district attorney who could not do private

19  law.  Chaiban told Graham that Murray was "on the other side."  Chaiban gave the same explanation to

20  his mother in a March 30, 2006 call.  In a later call, Chaiban described Murray as "psycho."  Kelley told

21  Kenny of his conclusion that Chaiban did not consider Murray his attorney, but Kenny instructed Kelley

22  to assign a taint agent to review the audio recordings out of an abundance of caution.

23       When LVMPD's Cybercrime Unit's backlog cleared in May, Kelley arranged to pick up

24  Hutchinson's laptop for forensic analysis.  Prior to that time, he left the laptop with Hutchinson, but

25  took a series of photographs of computer screens to preserve the evidence.  Kelley learned of Chaiban's

26  purchase of the Hummer vehicle through surveillance, not from Hutchinson.  Kelley did not pursue the

27  money laundering charge until June due to the length of time it took to review the voluminous

28  evidence.

1   Kelley explained that a taint agent is an agent who is not affiliated with an investigation who
2   listens to possibly protected or privileged information.  The purpose of the taint agent in this case was
3   to determine if Murray was a co-conspirator.  Kelley was unaware if taint agents had ever been used to
4   determine whether material was protected by the attorney-client privilege, but that was not the purpose
5   of assigning a taint agent in this investigation.  The instruction to assign a taint agent came from Schiess
6   to Kenny, who in turn told Kelley.  Kelley did not remember whether the attorney-client privilege was
7   discussed.  He did not know why Kenny spoke to Schiess, and was not involved in any discussion about
8   seeking a ruling from a court.

9   Kelley did not immediately provide Hamblin with the April 18th call requests because Hamblin
10   was busy.  Hamblin received these recordings approximately a month later, in late May.  Hamblin
11   completed his summary of these six calls in early June.  Hamblin sits at a desk across from Kelley.
12   Hamblin listened to the recordings from his desk.  Hamblin completed his second summary in late July.

13   No paperwork is required for Kelley to get audio recordings of inmate phone calls from CCDC.
14   Kelley has never discussed getting attorney calls from CCDC because he has never explicitly requested
15   attorney calls.  He did not know how the recordings are placed on CDs.  All of the audio recordings
16   Kelley received were reorganized on to two CDs from the original three CDs for Mr. Litman for
17   production in discovery.

18   Kelley met with Kenny and Hamblin in late July.  Hamblin briefed them on whether the
19   recordings contained evidence that could be used to bring charges against Murray.  They concluded that
20   more information was needed.  They also decided not to request recordings of additional
21   Chaiban/Murray calls because they believed that it would be a waste of time because Murray was aware
22   of Chaiban's indictment.  The final set of recordings was obtained on May 17, 2006.

23   Kelley did not listen to any phone conversations involving Graham's counsel, Mr. Fagerberg.
24   He did not discuss the contents of the Chaiban/Murray calls with AUSA Timothy Vasquez ("Vasquez")
25   whom Schiess had appointed to review the audio recordings of the Murray calls as the "taint attorney."
26   Kelley did not overhear any of the audio recordings during Hamblin's review because Hamblin was
27   using a head set to listen to the audio.  Hamblin did not tell Kelley about defense strategy.  Hamblin
28   only told Kelley that Murray expressed concern about her credit card being discovered in Chaiban's

1   residence.  Hamblin did not share any other information about the Chaiban/Murray calls or any calls

2   between Chaiban and Mr. Litman.

3   **Kirk Hamblin**

4          Detective Hamblin has worked for LVMPD for 17 years in criminal intelligence.  He received a

5   request from Kelley to listen to Chaiban's jail audio recordings.  He received the first set of audio

6   recordings of the Chaiban/Murray calls in June 2006, which contained over 30 calls.  He listened to

7   them at his desk on his desktop computer using headphones that precluded passers-by from listening in

8   on the recordings.  As he listened to the recordings, Hamblin typed summaries on the computer.  He

9   printed a copy for Kelley.  A few weeks later he received a second CD with 6-8 Chaiban/Murray calls.

10  He listened to these calls and prepared summaries as well.  Included in each recording he listened to

11  was a message stating that the call was from CCDC and it might be monitored and/or recorded.

12  Hamblin only discussed the calls at a meeting at the U.S. Attorney's office.  During the meeting Kelley

13  asked him about Murray's use of the credit card.  Hamblin said she expressed concern about the credit

14  card to Chaiban.  Hamblin did not discuss defense strategy, legal matters, or other matters of substance.

15  He told Kelley that the calls were 95% "lovey-dovey" and 5% "other."

16         On cross-examination, Hamblin said he met at the U.S. Attorney's office in late July, 2006.  He

17  said he had been told that the purpose of listening to the calls was to determine if Murray could be tied

18  to Chaiban's prostitution business.  He did not hear any "beeping" noise during the calls.  He recalled

19  conversations about income taxes, identity theft, obstruction of justice, "OR" or bail, search and

20  seizure, forfeiture, ICE issues and holds, discovery, charges prior to the indictment, a possible § 1983

21  civil action, defense strategy, discussions between Chaiban and Litman, Murray acting as Chaiban's

22  attorney, the activities of the prosecutor, Chaiban's psychological condition, Lisa Hutchinson, Joe

23  Kelley and Chaiban's business partners.  He did not recall discussions about money laundering,

24  prosecutorial misconduct or Joe Galvin from ICE.

25         Hamblin explained to the court that he only summarized those conversations he characterized as

26  being "non-personal" in nature, and did not summarize material of a personal nature.  He also said that

27  he probably received the first CD in May, not June.  He did not find evidence of a conspiracy involving

28  Murray.  He did not discuss any other facts of the case with Kelley, the investigating team or the

1  AUSAs.  He did not tell Kelley or anyone else about defense strategy, additional charges, defenses, or

2  conversations between Chaiban and Litman.

3  **Sergeant Richard Forbus Recalled**

4        Forbus was recalled because he did not have his notes with him at the time he initially testified.

5  He explained the process by which Kelley obtained the audio recordings from CCDC.  Kelley sent a list

6  of phone numbers and dates via email to Forbus.  Forbus used specialized telephone software to

7  download the audio recordings to a CD.  Forbus then sent the CDs to Kelley via interoffice mail, in a

8  "1000 miler envelope."  Each CD was labeled with a black marker with "Chaiban" along with the range

9  of dates requested, Chaiban's inmate ID and Forbus's initials.  Forbus admitted that labeling procedures

10  are not uniform throughout his office.  Forbus had no discussion with Kelley about Murray.  He did not

11  listen to the contents of the CD because he does not have time to do so and generally only listens to

12  calls concerning safety at CCDC.  He explained that there is no written policy for dealing with attorney

13  calls, but generally his staff stops listening to such calls when they determine that an attorney is on the

14  line.  He acknowledged, however, that he would honor a law enforcement request for a recording of an

15  attorney call.  There is no written policy governing such situations so his office follows state statutes.

16        On cross-examination, he admitted he would not remember the events he testified to without the

17  aid of his notes.  He elaborated that law enforcement requests for audio recordings may come over the

18  phone in addition to requests by email.  One of his staff members is Susan Young, a "Support Tech"

19  who pulls phone calls onto CDs.  An incident report is created every time a law enforcement request for

20  calls is made of the intelligence unit.

21        On re-direct, he explained that his staff keeps a log of requests.  He said that while Susan Young

22  may accept requests for audio recordings, she is not authorized to author reports because she is a

23  civilian.  In addition to email and phone requests, some agencies such as homicide have direct terminal

24  access to the audio recordings and can download them directly without the assistance of the intelligence

25  unit at CCDC.

26  **Thomas Fagerberg**

27       Fagerberg is an attorney from Austin, Texas who accepted *pro hac vice* representation of

28  Chaiban's co-defendant Graham in July of 2006.  He made three trips to Las Vegas, Nevada to defend

16

Graham.  On the second such trip, he met with Kenny regarding discovery.  She told him that very little of the voluminous discovery concerned Graham, so it was pointless to copy all of it.  She suggested that Fagerberg take a look at Litman's copy of the discovery instead.  Fagerberg also attended a meeting at the U.S. Attorney's office with Kenny, Litman and Kelley.  The Chaiban/Murray calls were discussed. Fagerberg asked Kelley if he listened to calls between himself and Graham.  Kelley denied listening to those calls.

Fagerberg accompanied Kelley to NLVDC where Graham was being held.  He could not recall the date of the visit.  The purpose of their visit was for Kelley and Graham to discuss her cooperation with the government.  Graham had already accepted a deal and agreed to cooperate with the government.  Fagerberg and Kelley discussed whether they should tell Graham that Chaiban planned to "dump" Graham after Chaiban's case had concluded.  Fagerberg characterized the decision to tell Graham this information as a "dilemma" because Graham had already accepted the government's offer of cooperation, but still had strong feelings for Chaiban.  Fagerberg was uncertain whether telling her this information would make her feel better or worse about testifying against Chaiban.  He learned that Chaiban planned to "dump" Graham from Kelley, and understood that Kelley learned this information from listening to calls between Chaiban and Murray.

On cross-examination, Fagerberg described himself as a friend of Litman's and said the two often socialize in public and will stay at one another's homes when in town on business instead of staying in a hotel.  Through a series of questions about the details of his trips to Las Vegas in association with this case, Fagerberg revealed that he was unable to recall many of the details of where he had gone, who was present, and what his own actions were.  He had no recollection of what discovery materials he reviewed or whether he reviewed Hamblin's summaries of the jail recordings.

**Officer Todd Williams**

Todd Williams ("Williams") worked for 14 years at the NLVDC where he is now a department trainer.  Previously, he worked in internal affairs where he handled inmate phone calls. He received email requests from Kelley for audio recordings of phone calls placed by Chaiban.  The public does not have access to inmate phone calls without a subpoena.  Law enforcement does have access to the calls. Kelley came in person to get the audio recordings.  Unless a subpoena is served, there is no written

1   record of his request.  Kelley did not have a subpoena.  Using specialized software, Williams is able to

2   download recordings by entering a date range and phone numbers.  He does not listen to the contents of

3   the recordings.  He had never heard of Murray until he met with the North Las Vegas City Attorney

4   prior to testifying.  There is no written policy for handling calls between inmates and their attorneys, but

5   there is a special "legal phone" available for such calls.  To use the phone, the inmate would initiate a

6   call using a calling card or call collect to the attorney and then request the call be transferred to the legal

7   phone.  A guard would verify that the caller was an attorney, and then transfer the call.  Williams has

8   listened to recordings of phone calls, but never calls with attorneys.  If an inmate requests a private line,

9   there is no set policy regarding whether the request should be honored.  Williams generally honors such

10  requests, but not all employees do so.

11      On cross-examination, he explained that every inmate housing unit has a legal phone and that

12  the legal phones have no buttons and cannot be used to make outgoing calls.  Inmates are notified that

13  calls placed on the regular, non-legal phones are being recorded in the telephone instructions on the

14  phones themselves and in an audio warning played at the beginning of each call.  Williams admitted

15  that he did not know if attorney calls are recorded, but indicated that he would never listen to them.

16      On re-direct, he clarified that the legal phones are generally for use by public defenders, but an

17  exception is made for private attorneys.  He acknowledged that inmate requests to use the legal phones

18  to place calls to private attorneys are not always honored, but stated that he had never heard of a denial

19  until Mr. Litman indicated that Chaiban had been denied such a request.  Inmates are not provided with

20  instructions on how to make calls to their attorneys and are not asked to sign a waiver.  Inmates are not

21  advised that their calls are recorded at intake.

22  **Chief Joseph Forti**

23      Joseph Forti ("Forti") has worked in law enforcement for 26 ½ years, the first 24 years as an

24  undercover narcotics officer, and now as Assistant Chief of Detention Services where he is in charge of

25  NLVDC.  He described the process of booking inmates, which includes providing the inmates with a

26  handbook.  Inmates are not provided a waiver form concerning monitoring or recording of phone

27  conversations at booking.  The handbook says special phones are available for inmates to call "legal

28  assistance agencies" and lists the Federal Public Defender and Clark County Public Defender as

1  examples.  While there is a phone available for inmates to call private attorneys, in practice inmates are

2  not allowed to use the phone for that purpose.  Such requests by inmates have been denied in the past.

3  After reviewing the subpoena in the course of preparation for his testimony, Forti learned that Chaiban

4  had been denied such a request.  NLVDC does not have a written policy regarding attorney-client calls,

5  but the calls are not monitored.  The calls are recorded, however, and Forti acknowledged that

6  sometimes staff listen to the calls.  A law enforcement request for an audio recordings of an attorney-

7  client call may be made in writing or over the phone to the officer in charge.  Law enforcement agencies

8  may request audio recordings, but Forti was "doubtful" that private attorneys could make such a request

9  without a subpoena or warrant.

10      On cross-examination, Forti clarified that only indigent inmates are authorized to use the legal

11  phones.  On re-direct, Forti indicated that he was aware of a state statute requiring people to be notified

12  their phone conversations are being monitored.  People may be made aware of monitoring by a "beep

13  beep" sound during the call, but Forti did not have personal knowledge of whether NLVDC's phones

14  made such a sound.  On re-cross, Forti explained that an audio warning may be a substitute for the

15  "beep beep" sound.  He also presented a portion of the North Las Vegas Police Department Manual,

16  which was marked and admitted as Exhibit J, which states on page 9 of 24 that phones shall be

17  provided to inmates at no charge to call attorneys, and that if an attorney is not listed with NLVDC's

18  telephone system to block recordings, an inmate may request that the attorney's phone number be added

19  to the system.  On re-re-direct, Forti acknowledged that the policy described in Exhibit J is not provided

20  in any form to inmates.

21  **Sergeant David Powell**

22      David Powell ("Powell") works at NLVDC.  He is aware of the phone policies at NLVDC and

23  aware Chaiban is an inmate.  He has no memory of Chaiban requesting to place a non-monitored phone

24  to call his attorney.  It is an uncommon request, and can be made to officers other than Powell.

25  **Rhonda Turner-Lewis**

26      Rhonda Turner-Lewis ("Turner-Lewis") served as a legal assistant in the U.S. Attorney's office

27  from November 10, 1997 to September 8, 2006.  She assisted Kenny on the Chaiban case, and later

28  assisted Schiess when he took over the case upon Kenny's departure.  She was the only legal assistant

1   assigned to this case.  She organized the duplication, bate stamping, and delivery of discovery materials

2   to defense counsel.  She received discovery materials from Kelley, who was the case agent.  Kelley was

3   not involved in bate stamping the discovery.  Kelley created duplicates of CDs, however, so Turner-

4   Lewis simply included the CDs with the paper discovery materials and was not involved in CD

5   duplication.  She did not review any of the discovery material and did not discuss its contents with

6   Kelley.  She was not aware of any missing CDs and had no discussions about missing CDs.  Although

7   other case agents were involved with the Chaiban case, Turner-Lewis received the discovery materials

8   only from Kelley.  She did not talk to Kelley about Murray and is not familiar with Murray.

9   **Susan Young**

10      Susan Young ("Young") is a civilian Law Enforcement Support Tech at CCDC where she has

11   worked with the inmate telephone system for 23 years.  She handled several of the requests from Kelley

12   for audio recordings of inmate phone calls placed by Chaiban.  She used specialized telephone software

13   to run a query for Chaiban's phone calls and downloaded the results to a CD which was provided to

14   Kelley via "1000 miler" interoffice mail.  Young's testimony about when she received the requests was

15   consistent with Kelley's testimony about when he made the requests.  Kelley did not provide her with a

16   subpoena or warrant.  She did not listen to the audio recordings or discuss their contents with Kelley.

17   She does not monitor inmate phone calls, but is aware that monitoring occurs and is familiar with the

18   procedure for monitoring.  She has not heard a "beep beep" call during audio recordings.  She has been

19   told inmates are notified through posted signs of the policy of recording and monitoring phone calls, but

20   she does not work in areas where she would see such signs herself.

21   **Timothy Vasquez**

22      Timothy Vasquez ("Vasquez") is an AUSA and criminal prosecutor.  On July 20, 2006, he was

23   contacted by Schiess to serve as the "taint agent" to review the audio recordings of the Murray calls.

24   Vasquez understood a taint attorney was required because Murray had been Chaiban's attorney, and he

25   was to listen to the recordings to determine if they contained attorney-client privileged materials.  He

26   concluded that the recordings contained legal discussions, but that the privilege was waived because

27   both Chaiban and Murray were aware their the conversations were being recorded.  He did not discuss

28   / / /

1  the specific contents of the recordings with Schiess or Kelley, although he sent an email to Schiess

2  about his general conclusions.  The email was marked and admitted as Exhibit D-9.

3  **Barbara Graham**

4       Barbara Graham is the mother of Chaiban's co-defendant Erin Graham.  She has lived in Salem,

5  Oregon for the past 17 years.  For the past year, she has known that her daughter and Chaiban had been

6  in a relationship and lived together in Las Vegas.  She only spoke to Chaiban, whom she knows as

7  "Eddy," once, but her daughter often spoke of him.  Barbara Graham knew her daughter moved out of

8  Chaiban's home following his arrest and had gone to San Diego to stay with Chaiban's mother.  She

9  spoke to her daughter every couple of weeks as she tried to limit phone calls.  She was contacted by

10 Pretrial Services concerning the release or detention of her daughter.  She told Pretrial Services she

11 thought release would be inappropriate given her daughter's history.  She spoke with Kelley before her

12 daughter's detention hearing, and Kelley told her about the federal charges.  After the detention hearing,

13 Kelley called her to say that he had tapes that revealed that Chaiban would end his relationship with

14 Erin Graham after the conclusion of his case.  Barbara Graham told Kelley she did not want to be

15 involved in legal matters.

16      On cross-examination, Barbara Graham said that during the second call Kelley spoke of the

17 possibility of her daughter cooperating with the government in exchange for a favorable plea

18 agreement.  Kelley explained to Barbara Graham that if her daughter wanted to cooperate she should

19 request to see him because Kelley was prohibited from contacting Erin directly.  Barbara Graham

20 conceded that there may have been a third phone call with Kelley, and that her recollection of what was

21 said during which phone call had blurred because of the passage of time and because she was upset over

22 her daughter's arrest.  She spoke to her daughter a few times during her stay with Chaiban's mother in

23 San Diego and Erin said she had been speaking with Chaiban and that the relationship was still going

24 well.

25      Barbara Graham explained to the court that she did not know the source of the tape Kelley

26 referenced during his second call or to whom Chaiban was divulging his plan to end his relationship

27 with Erin.  Kelley was professional and never impolite or aggressive over the phone.

28 / / /

**Daniel Schiess**

Schiess is an AUSA and criminal prosecutor who joined the U.S. Attorney's office in 1992. Sometime in April of 2006, Kenny approached him to get his opinion on Kelley having overheard a single conversation between Chaiban and Murray. She believed that the recording process waived the attorney-client privilege, so there was no Sixth Amendment issue. Schiess agreed, but told her to establish a taint team anyway out of an abundance of caution. Schiess and Kenny spoke regularly about the case. Kenny expressed her frustration with Litman to Schiess. She said Litman was threatening to file a complaint with the state bar association claiming prosecutorial misconduct concerning the audio recordings of the Murray calls, and was using the threat as a form of leverage in plea negotiations. Schiess said that he works in a supervisory role over Kenny and other attorneys in his division, and that as part of that role he reviews indictments. He did not have an opportunity to review the first superseding indictment in this case, however, because he was in the middle of a major trial at the time. He did review the second superseding indictment, and had spoken to Kenny about problems with the predicate act used to support the aggravated identity theft charge. Schiess was aware that Litman had raised this issue with Kenny by email.

Schiess received an email from Vasquez, the taint attorney, on October 5, 2006, but did not read it and mistakenly thought Vasquez had never sent it. He asked Vasquez to re-send the email on November 9, 2006, and simultaneously discovered the original October 5, 2006 email. Besides the email, which has been marked and admitted as Exhibit L, the only conversation Schiess had with Vasquez regarding the Murray calls was Schiess' question to Vasquez whether the calls were primarily "lovey-dovey" in nature. He also explained the discrepancies in how discovery documents were bate stamped in the case. When he took over the case from Kenny after she left the office for a sabbatical, he had the discovery materials scanned and run through optical character recognition as he prefers electronic discovery over paper discovery. During the course of conversion to electronic discovery, the documents received new bate stamp numbers because the process of correlating the paper bate stamp numbers to the new electronic format was too tedious. The electronic discovery was placed on a CD and given to Litman along with the paper discovery. Schiess was confident that aside from the different

/ / /

1  bate stamp numbers, the documents contained in the paper discovery and the electronic discovery on

2  CD were identical.

3  **Kirk Hamblin Recalled**

4         After testifying, Hamblin found documents confirming the dates on which he made the

5  summaries of the Chaiban/Murray calls.  He received the first set of calls on May 31, 2006 and

6  completed the summary on June 1, 2006.  He received the second set of calls on July 27, 2006.  That

7  same day he listened to them and created his summary.  He also recalled after testifying that he spoke to

8  Kelley once about the contents of the Chaiban/Murray calls.  Kelley approached him after he testified

9  and asked him to look through his summaries for references to "Lizzie" to see if that refreshed his

10 recollection.  Hamblin did so, and then recalled that after the meeting at the U.S. Attorney's office with

11 Kenny, he and Kelley spoke briefly in the hallway.  Hamblin had asked Kelley who "Lizzie" was

12 because of an exchange he heard on the audio recording that concerned him.  Specifically, Murray had

13 asked Chaiban "Is Lizzie gone gone?," and Chaiban replied that he was going to "send her home."

14        On cross-examination, Hamblin explained that he asked Kelley who "Lizzie" was because he

15 was concerned that "Lizzie" might be a crucial witness or part of the case, and that Chaiban and Murray

16 were conspiring to prevent her from testifying.  Hamblin said that he did not disclose any other contents

17 of the audio recordings to Kelley or anyone else other than those that concerned Murray's possible

18 criminal involvement.  Hamblin did not know who "Lizzie" was.

19 **Joseph Kelley Recalled**

20        Kelley first spoke to Erin Graham on March 8, 2006, the day Chaiban was arrested.  He met her

21 in the parking lot of the Meadows Mall in Las Vegas.  He detained her, but did not arrest her.  He told

22 her she should cooperate with the government in prosecuting Chaiban.  He also told her that Chaiban

23 would dump her because in the past Chaiban had ended relationships immediately following his

24 prosecution and imprisonment.  He cited Chaiban's relationships with Hutchinson, June Markham,

25 Flora Stone, Lisa Katz, and an ex-wife, which Chaiban ended after being prosecuted.  Hutchinson ran

26 Chaiban's prostitution business in 2002, and when he got out of prison on another charge, he ended the

27 relationship.  The same scenario occurred in Chaiban's relationship with June Markham.  Kelley did not

28 know when Chaiban's relationship with Lisa Katz ended, but did know that the two had lived together

1   and that he had sexually assaulted her.  Kelley also had information about Hutchinson's relationship

2   with Chaiban from letters exchanged between the two he had read.

3        Kelley spoke with Barbara Graham shortly after Erin Graham's arrest.  He wanted to get

4   background information for the prosecutor.  Barbara Graham asked him to call her after the detention

5   hearing with an update.  He told Barbara Graham about the possibility of a superseding indictment and

6   an offer for Erin to cooperate with the government.  He also told her that based on what he had heard in

7   recordings of telephone conversations between her daughter and Chaiban that their relationship was

8   deteriorating.  Kelley did not learn that information from listening to the Murray calls.  No single call

9   indicated to Kelley that Chaiban would leave Graham; instead, it was his general impression from

10  listening to numerous calls.  He believed that Graham's relationship with Chaiban was following an

11  identical pattern as Hutchinson's relationship with Chaiban.

12       Prior to the meeting at the U.S. Attorney's office, Kelley spoke to Hamblin.  Hamblin said the

13  Murray calls were 95 percent "lovey-dovey."  Kelley asked very specific questions of Hamblin

14  concerning Murray's possible complicity in Chaiban's criminal activities to avoid spoiling the taint

15  procedure.  The discussion at the meeting concerned Murray's credit card and other possible evidence

16  of a conspiracy.  During the meeting, Kenny called Dan Hollingsworth who was working on the

17  forfeiture aspect of the case.  Hamblin asked Kelley who Lizzie was and expressed concern about

18  witness tampering.  After Hamblin initially testified in this case, Kelley approached him about possible

19  mistakes in his timeline of events and about references to "Lizzie" in his summaries.  He told Hamblin

20  to phone Schiess if after reviewing his summaries any further information came to mind.

21       At the July 31, 2006 meeting at the U.S. Attorney's office, Litman raised the Sixth Amendment

22  claim that is the subject of the instant motion.  Litman had said he would file an ethics claim with the

23  state bar association alleging that Kenny had violated Chaiban's rights.  Kelley characterized Litman's

24  allegation as "threatening" and believed it was made as leverage in plea negotiations.  That same day,

25  Kenny told Kelley to make copies of the audio recordings of the Chaiban/Murray calls and summaries

26  for Vasquez to review.  Kelley received the summaries via email and printed them out directly from his

27  email program using a procedure that allowed him to directly print the summaries without opening

28  / / /

1  them.  Kelley did not read the summaries.  He sealed the print-outs, and took them along with copies of

2  the audio recordings on CD to Vasquez.

3      On August 10, 2006, Kelley met with Fagerberg and Agent Kidwell at the detention center

4  where Erin Graham was being held.  Kelley told Fagerberg that he was going to tell Graham that

5  Chaiban would dump her once the criminal prosecution had concluded.  When the three met with

6  Graham, it was Kelley who told her about Chaiban's plan.

7      Kelley clarified a series of emails contained in Exhibit D4 between Kelley and Forbus in which

8  Kelley wrote that the AUSA had lost the CDs.  He explained that he had meant to write that the

9  Technical Analysis office had lost the CDs, not the AUSA.  He had not given any CDs to the AUSA on

10  June 12, 2006, when these email messages were exchanged.  Kelley further explained that upon further

11  review, he discovered that the CDs had not been lost at all, but merely misplaced in his office when he

12  accidentally put them in a file from another of his cases.  By the time Kelley discovered that the CDs

13  had been misplaced, rather than lost, Forbus had already created duplicates.  Kelley sent the duplicates

14  to Litman for inclusion in the case discovery materials.

15      On cross-examination, Kelley said that while other law enforcement agencies have direct

16  terminal access to CCDC's inmate telephone audio recordings, the Criminal Investigations Unit where

17  he works does not.

18      He could not point to an individual phone call between Chaiban and Graham that indicated to

19  him that Chaiban was planning to dump Graham because there were more than 60 phone calls between

20  the two.  He reviewed his synopsis of the phone calls and found no reference to "dumping," but this

21  was not surprising to him because he only synopsized those portions of the phone calls that were of

22  evidentiary value to the case.

23      Kelley said that when Hamblin approached him about a reference to "Lizzie" Hamblin heard

24  during his review of the Murray calls, Hamblin expressed a concern about possible witness tampering.

25  Kelley recalled saying something to the effect of "that wouldn't surprise me."

26  / / /

27  / / /

28  / / /

1

**DISCUSSION**

2

**I.      THE ATTORNEY-CLIENT PRIVILEGE**

3

_____Chaiban argues the government violated his attorney-client privilege by monitoring and

4

recording his phone calls to Murray.  The attorney-client privilege protects confidential disclosures

5

made by a client to an attorney to obtain legal advice and an attorney's advice in response to such

6

disclosures.  United States v. Chen, 99 F.3d 1495, 1501 (9th Cir. 1996) (quotation omitted), cert.

7

denied, 520 U.S. 1167 (1997).  Not all communications between an attorney and client are privileged.

8

Information such as the identity of the client, the amount of the fee, the identification of payment by

9

case file name, the general purpose of the work performed, and whether an attorney coached a client in

10

his testimony is not privileged.  See e.g. United States v. Carrillo, 16 F.3d 1046, 1050 (9th Cir. 1994);

11

Clarke v. American Commerce Nat'l Bank, 974 F.2d 127, 129 (9th Cir. 1992).  Similarly, when an

12

attorney is merely communicating information, such as an order to appear in court, the communications

13

between the attorney and the client are not privileged.  United States v. Gray, 876 F.2d 1411 (9th Cir.

14

1989) (holding attorney-client privilege did not preclude lawyer from testifying he advised client of the

15

sentencing date in prosecution of client for failure to appear); McKay v. Commissioner, 886 F.2d 1237

16

(9th Cir. 1989) (holding testimony of taxpayer's attorney that the gave taxpayer a copy of deficiency

17

notice from the IRS in ample time to file a petition timely did not violate the attorney-client privilege).

18

        The attorney-client privilege is a rule of evidence; it has not been held a constitutional right.

19

Clutchette v. Rushen, 770 F.2d 1469, 1471 (9th Cir. 1985).  "Because it impedes the full and free

20

discovery of the truth, the attorney-client privilege is strictly construed."  Weil v. Investment/Indicators,

21

Research and Management, Inc., 647 F.2d 18, 24 (9th Cir. 1980).  The party asserting the attorney-

22

client privilege has the burden of proving the attorney-client privilege applies.  Id. at 25.  "One of the

23

elements that the asserting party must prove is that it has not waived the privilege."  Id.  The attorney-

24

client privilege is waived when communications are made in the presence of third parties.  United

25

States v. Gann, 732 F.2d 714, 723 (9th Cir.), cert. denied, 469 U.S. 1034 (1984).  It is well established

26

that "voluntary disclosure of the content of a privileged attorney communication constitutes a waiver of

27

the privilege as to all other such communications on the same subject."  Id.  In Weil, the Ninth Circuit

28

recognized that waiver of the privilege "may be effected by implication" and by inadvertent disclosure.

1    Id.  Additionally, "the subjective intent of the party asserting the privilege is only one factor to be

2    considered in determining whether waiver should be implied."  Id.

3         The court finds that both CCDC and NLVDC have an across the board policy of recording all

4    telephone conversations except for (1) calls to attorney numbers registered with the facility's telephone

5    carrier which are automatically blocked and are, therefore, incapable of being recorded; and (2) calls

6    placed from the "legal phones" used for calls between inmates and the State and Federal Public

7    Defender's Office.  NLVDC also permits inmates to request calls placed to attorneys from the phones

8    available to them for all purposes be transferred to the "legal phones" which are not monitored or

9    recorded.  The court also finds that both CCDC and NLVDC provide clear and unequivocal notices to

10   inmates that their calls may be monitored or recorded.  CCDC places large signs on the walls above the

11   phones inmates use, and in the booking area.  CCDC also has a sign on the phones themselves.

12   NLVDC places the warning on each phone.  Finally, the court finds that both CCDC and NLVDC have

13   phone systems which provide a verbal notice at the beginning of each call made which advises both the

14   caller and the recipient who accepts a call from each facility that the calls may be monitored and

15   recorded.

16        Chaiban submitted a declaration after the evidentiary hearing conducted on November 22, 2006

17   which asserted he read the signs at CCDC, but was under the impression that his calls to Murray were

18   not recorded.  (Chaiban Declaration, #82, ¶¶ 6, 7, 8.)[1]  His declaration also avers that the signs at CCDC

19   read: "All calls from this phone are subject to monitoring or recording with the exception of calls to an

20   attorney."  (Id., ¶ 7.)  Chaiban's declaration which avers that the signs at CCDC indicate calls to an

21

22        [1]  Chaiban requested and received leave to submit this declaration after Mr. Litman and Mr.
     Schiess had stipulated: (1) that both CCDC and NLVDC inmates may confer confidentially in person
23   with their attorney and that these conferences are neither recorded nor monitored, and (2) that inmates
     may send letters to attorneys which, when properly sent, are not read or monitored.  Mr. Litman
24   confirmed that he had been requested in an e-mail to stipulate to both matters, and had agreed to
     stipulate by responding to Mr. Schiess' e-mail indicating "I will so stipulate because I believe that."  Mr.
25   Litman confirmed at the November 22, 2006 hearing that he agreed to stipulate to both matters and
     believed the stipulation was accurate.  However, he indicated that his client disputed the stipulation.
26   The court gave Chaiban leave to make an offer of proof to support a request to withdraw Mr. Litman's
     stipulation.  Chaiban's Declaration (#82) was submitted in response.  Having reviewed Chaiban's
27   declaration, the stipulation of counsel remains accepted.

28

1   attorney are not monitored or recorded is, in the light most favorable to Chaiban, wrong.  Photocopies

2   of the signs posted at CCDC were introduced during the testimony of Sergeant Forbes.  The notice

3   posted above the phone banks at CCDC reads: **"NOTICE ALL PHONE CONVERSATIONS ARE**

4   **SUBJECT TO BEING MONITORED LVMPD."**  (See, Government Exhibit "C;" See also, Kelley

5   Declaration and attached exhibits filed in response to Chaiban Declaration (#86).)

6          Based on these findings of fact, the court concludes Chaiban and Murray could not reasonably

7   have expected that their conversations would be confidential and that Chaiban's telephone

8   conversations with Murray at issue here are not protected by the attorney-client privilege.  Chaiban's

9   decision to proceed with the conversations, despite notification the conversations were subject to being

10  monitored and recorded, is no different from electing to proceed with these conversations

11  notwithstanding the known presence of a third party within earshot of the conversations.

12         Several circuits which have addressed privilege issues in the context of jail recordings have

13  reached the same conclusion.  In United States v. Hatcher, the Eighth Circuit held:

14                 The presence of the prison recording device destroyed the attorney-client

15                 privilege.  Because the inmates and their lawyers were aware that their

16                 conversations were being recorded, they could not reasonably expect that

17                 their conversations would remain private.  The presence of the recording

18                 device was the functional equivalent of the presence of a third party.

19                 These conversations were not privileged.

20  323 F.3d 666, 674 (8th Cir. 2003).  In United States v. Madoch, 149 F.3d 596, 602 (7th Cir. 1998), the

21  Seventh Circuit held that the marital communications privilege did not apply where the wife knew that

22  her husband was in jail in light of the "well-known need for correctional institutions to monitor inmate

23  conversations."  Similarly, the Fifth Circuit held that inter-spousal communications during a prison visit

24  were not privileged where eavesdropping could reasonably be expected to occur.  United States v.

25  Harrelson, 754 F.2d 1153, 1169-70 (5th Cir. 1985).  Other courts have reached the same result by

26  finding that a voluntary disclosure does not amount to a waiver of the privilege, but extinguishes the

27  element of confidentiality that one must show in order to claim the privilege.  See, e.g., United States v.

28  Pauldino, 487 F.2d 127, 130 (10th Cir. 1973), cert. denied, 415 U.S. 981 (1974); In re Horowitz,

1  482 F.2d 72, 81 (2nd Cir.), cert. denied, 414 U.S. 867 (1973).  See also, United States v. Lentz, 419 F.

2  Supp. 2d 820, 828-29 (E.D. Va. 2005) (holding inmates waive any privilege protection for telephone

3  conversations when they proceed with conversations in the face of notice the calls are being recorded

4  and subject to monitoring.)

5         All of these decisions recognize that notice conversations may be monitored or recorded

6  destroys any expectation of privilege.  Chaiban continued to talk to Murray and Murray continued to

7  talk to Chaiban after both were on notice their conversations were subject to being monitored and

8  recorded.  As the party asserting the attorney-client privilege, Chaiban has the burden of establishing

9  the privileged nature of the communications, and that he has not waived the privilege.  Chaiban has not

10  met his burden of establishing that he did not waive the attorney-client privilege by engaging in

11  conversations he was on notice were subject to being monitored and recorded.  His bare assertion that

12  he did not intend to waive the attorney-client privilege is an expression of subjective intent which is

13  insufficient on this record to make out the necessary element of non waiver.  Weil, Id. at 25.

14         The Ninth Circuit has held that "any expectation of privacy in outbound calls from prison is not

15  objectively reasonable and that the Fourth Amendment is, therefore, not triggered by the routine taping

16  of such calls."  United States v. Van Poyck, 77 F.3d 285, 291 (9th Cir. 1996).  However, Poyck also

17  stated that this analysis did not apply to properly placed calls between a defendant and his counsel

18  which the institution does not monitor.  Id. at n. 9.  The court has concluded that Chaiban's calls to

19  Murray were not privileged on the facts presented and found here.  However, because the Ninth Circuit

20  has not yet specifically decided whether the attorney-client privilege is waived in the context before the

21  court, the court will address Chaiban's Sixth Amendment claims.

22  **II.    THE RIGHT TO COUNSEL**

23         The Sixth Amendment provides that "[i]n all prosecutions, the accused shall enjoy the right . . .

24  to have the Assistance of Counsel for his defense."  U.S. Const., amend. VI.  The Sixth Amendment

25  right to counsel is meant to assure fairness in the adversary criminal process.  Danielson, 325 F.3d at

26  1066 (citing U.S. v. Cronic, 466 U.S. 648, 656 (1984)).  When the Sixth Amendment is violated, a

27  serious risk of injustice infects the trial itself.  Id. (internal citations and quotations removed).  Thus

28  when a criminal defendant alleges the prosecution has infringed upon his or her Sixth Amendment right

1   to counsel, the Supreme Court has instructed courts to evaluate such prosecutorial behavior based on its

2   effect on the fairness of the trial.  Id. (citing U.S. v. Agurs, 427 U.S. 97, 110 (1976)).  The Ninth Circuit

3   reviews *de novo* whether a defendant's Sixth Amendment rights were violated as a question of law.

4   U.S. v. Hernandez, 937 F.2d 1490, 1493 (9th Cir. 1991) (citing U.S. v. McConney, 728 F.2d 1195,

5   1201 (9th Cir.) (en banc), cert. denied, 469 U.S. 824 (1984)).

6        "Despite the high approbation our system has for the attorney-client privilege, the Supreme

7   Court has twice held that government invasion of that privilege or the defense camp is not sufficient by

8   itself to cause a Sixth Amendment violation.  The defendant must have been *prejudiced* by such

9   actions."  United States v. Hernandez, 937 F.2d 490, 493 (9th Cir. 1991) (citing United States v.

10  Morrison, 449 U.S. 361, 365 (1981), and Weatherford v. Bursey, 429 U.S. 545, 558 (1977)).  Relying

11  on Weatherford, and its own decision in United States v. Glover, 596 F.2d 587 (9th Cir. 1979), the

12  Ninth Circuit has held that:

13              mere government intrusion into the attorney-client relationship, although

14              not condoned by the court, is not of itself violative of the Sixth

15              Amendment right to counsel.  Rather, the right is only violated when the

16              intrusion substantially prejudices the defendant.

17  United States v. Irwin, 612 F.2d 1182, 1186-87 (9th Cir. 1980).

18      In Irwin, the Ninth Circuit held that prejudice may be demonstrated when (1) evidence gained

19  through the interference is used against the defendant at trial; (2) the prosecution uses confidential

20  information pertaining to the defense plans and strategy; (3) the government's interference destroys the

21  defendant's confidence in his attorney; and (4) from other actions designed to give the prosecution an

22  unfair advantage at trial.  Id.  The Ninth Circuit has articulated what a defendant must show to establish

23  a Sixth Amendment violation:

24              In order to show that the government's alleged intrusion into the attorney-

25              client relationship amounted to a violation of the Sixth Amendment, a

26              defendant must show, at a minimum, that the intrusion was purposeful,

27              that there was communication of defense strategy to the prosecution, or

28              that the intrusion resulted in tainted evidence.

1   United States v. Fernandez, 388 F.3d 1199, 1240 (9th Cir. 2004).  The Ninth Circuit requires a

2   defendant alleging a Sixth Amendment violation for improper governmental interference with a

3   confidential relationship between the defendant and his counsel to show "substantial prejudice."

4   "Substantial prejudice results from the introduction of evidence gained through the interference against

5   the defendant at trial, from the prosecution's use of confidential information pertaining to defense plans

6   and strategy, and from other actions designed to give the prosecution an unfair advantage at trial."

7   Williams v. Woodford, 306 F.3d 665, 683 (9th Cir. 2002).

8       Most Sixth Amendment interference cases involve allegations the prosecutor obtained certain

9   evidence as a result of improper interference with the attorney-client relationship, most often an

10  incriminating statement made to a government informant, or physical evidence.  United States v.

11  Danielson, 325 F.3d 1054, 1070.  In cases where it is alleged the prosecution obtained a particular piece

12  of evidence by interfering with the attorney-client relationship, the Ninth Circuit has placed the burden

13  on the defendant to show substantial prejudice.  Id. at 1070.  For example, in U.S. v. Bagley, 641 F.2d

14  1235, 1238 (9th Cir. 1981), the court required the defendant to show "that he suffered prejudice at trial

15  as a result of evidence obtained from interrogation outside the presence of counsel."  "Placing the

16  burden on the defendant in such cases makes good sense, for the defendant is in at least as good a

17  position as the government to show why, and to what degree, a particular piece of evidence was

18  damaging."  Danielson, 325 F.3d at 1070.

19      By contrast, the Ninth Circuit has recognized that when it is established the prosecution's

20  wrongful intrusion in the attorney-client relationship results in obtaining the defendant's trial strategy,

21  "the question of prejudice is more subtle."  Id.  "In such cases, it will often be unclear whether, and

22  how, the prosecution's improperly obtained information about the defendant's trial strategy may have

23  been used, and whether there was prejudice.  More important, in such cases the government and the

24  defendant will have unequal access to knowledge."  Id.  As a result, the Ninth Circuit has adopted a two

25  step burden-shifting analysis if it is established the prosecution has acquired defense plans and strategy.

26  Id. at 1071.  Under this two step analysis, the defendant bears the initial burden of making "a *prima*

27  *facie* showing of prejudice."  Id. (citing U.S. v. Mastroianni, 749 F.2d 900, 907-08 (1st Cir. 1984)).  To

28  make a *prima facie* showing of prejudice, the defendant must demonstrate the government "acted

31

1  affirmatively to intrude into the attorney-client relationship and thereby to obtain the privileged

2  information." Id.  Once a *prima facie* showing has been made, the burden shifts to the government to

3  show there has been no prejudice to the defendant as a result of these communications.  Id.  (quoting

4  Mastroianni, 749 F.2d at 908) (internal quotations removed).  "The mere assertion by the government of

5  the integrity and good faith of the prosecuting authorities is not enough"; rather, "the government must

6  present evidence, and must show by a preponderance of that evidence that all of the evidence it

7  proposes to use and all of its trial strategy were derived from legitimate independent sources."  Id. at

8  1072 (quoting Kastigar v. U.S., 406 U.S. 441, 460 (1972)) (internal quotations removed).  The

9  "prosecution team can avoid this burden either by not improperly intruding into the attorney-client

10  relationship in the first place, or by insulating itself from privileged trial strategy information that might

11  thereby be obtained."  Id.  "In the absence of such an evidentiary showing by the government, the

12  defendant suffered prejudice."  Id.

13        Chaiban contends that the prosecution's use of privileged information he communicated in calls

14  to Murray has been so prejudicial that it has impaired his ability to mount a defense at trial.  Six of his

15  seven Sixth Amendment interference with counsel claims are based on physical or testimonial evidence

16  the government is alleged to have learned by listening to the Chaiban/Murray calls.  With respect to

17  these six claims, Chaiban bears the burden of showing substantial prejudice.  The remaining claim, that

18  the government obtained defense strategy by listening to those calls must be analyzed applying the two-

19  step test articulated by the Ninth Circuit in Danielson.  The court will address Chaiban's claims in the

20  order in which they were addressed in his papers.

21        **1.      Chaiban's Claim that the Government Used Information from the**

22        **Chaiban/Murray Calls to Obtain the First and Second Superseding Indictments**

23        Chaiban points out that not long after Kelley obtained the audio recordings from CCDC, the

24  government sought and obtained a superseding indictment on May 10, 2006.  He believes that the

25  government only learned the information it used to seek the first superseding indictment from listening

26  to the Chaiban/Murray calls.  He also points out that not long after Hamblin reviewed the second set of

27  Chaiban/Murray calls the government sought and obtained a second superseding indictment on

28  / / /

1   August 16, 2006.  Chaiban believes that Hamblin either told Kelley and Kenny of the contents of the

2   second set of Murray calls, or that Kelley and/or Kenny reviewed them.

3           The original indictment returned March 15, 2006, contained a single count of false use of a

4   Social Security number in violation of 42 U.S.C. § 408(a)(7)(B).  The first superseding indictment

5   returned May 10, 2006, contained two counts of aggravated identity theft in violation of 18 U.S.C.

6   § 1028A, two counts of false use of a Social Security number in violation of 42 U.S.C. § 408(a)(7)(B),

7   one count transportation of a female for prostitution in violation of 18 U.S.C. § 2421, and one count of

8   obstruction of justice in violation of 18 U.S.C. § 1503.  The final obstruction of justice count also

9   named Graham.  The second superseding indictment, returned August 16, 2006, contained six counts of

10  false use of a Social Security number in violation of 42 U.S.C. § 408(a)(8), five counts of aggravated

11  identity theft in violation of 18 U.S.C. § 1028A, two counts transportation of a female for prostitution

12  in violation of 18 U.S.C. § 2421, one count of conspiracy involving money laundering and aiding and

13  abetting in violation of 18 U.S.C. § 1956(h) and 2, and one count of obstruction of justice in violation

14  of 18 U.S.C. § 1503.  The conspiracy and obstruction of justice counts also named Graham.  There were

15  also forfeiture allegations.

16          Kelley testified that when the government sought the initial indictment on March 15, 2006, it

17  did not have the forensic analysis of Hutchinson's laptop because of a backlog of work at the

18  Cybercrime Unit.  The government did not seek an indictment for violations of the Mann Act and for

19  money laundering until after obtaining and analyzing information from Hutchinson's laptop.  Kelley

20  indicated, however, that at the time of the original indictment, he had ample information that Chaiban

21  had engaged in trafficking in prostitutes across state lines and identity theft.  Specifically, Kelley had

22  reviewed many websites Chaiban used to solicit customers for his prostitutes.  Using phone number

23  subscriber identification for the phone numbers listed on the websites, Kelley was able to link the sites

24  to Chaiban.  Chaiban operated these websites and registered the phone numbers under false identities.

25  Evidence of Chaiban's use of the identity "Miguel Medina" and several others is attached to the search

26  warrant for a search of Chaiban's residence on March 7, 2006.  (See Ex. Q.)  Kelley had also met on

27  numerous occasions with Hutchinson and Pangellian from whom he had learned of how Chaiban

28  operated the prostitution business.  In addition, Kelley had viewed information stored on Hutchinson's

33

1  laptop during their meetings and was generally aware of some of the information it contained.  Kelley

2  also had information derived from an extensive undercover operation that had arrested some of

3  Chaiban's prostitutes, including Markham.  Markham agreed to provide the government with

4  information about Chaiban.  This information was attached to the search warrant application for

5  Chaiban's residence, dated March 7, 2006.  (See Ex. Q.)  Finally, information that lead to the

6  obstruction of justice count came from listening to Chaiban's calls to Graham, not to Murray.  In these

7  calls, Chaiban instructed Graham to shut down his websites and to take other action so that

8  incriminating information could not be found by the investigators.  Kelley testified before the Grand

9  Jury that calls from Chaiban to Graham while Chaiban was at CCDC was the source of this

10  information.  (See Grand Jury Testimony of Joe Kelley, May 10, 2006 at 10, admitted as Ex. S.)

11  Kelley had all of this information prior to the time the government sought the original

12  indictment.  The first superseding indictment was obtained after the government had the forensic

13  analysis of Hutchinson's laptop which Kelley believed was necessary before seeking the first

14  superseding indictment.  The court found Detective Kelley's testimony credible that he had multiple

15  independent sources of information that lead to the additional counts contained within this first

16  superseding indictment.  His testimony about the sources of his information is corroborated by the state

17  search warrant application, multiple police reports, and grand jury testimony admitted in the record

18  during the evidentiary hearings.

19  With respect to the second superseding indictment, the government sought additional counts of

20  the same charges, added one new charge for conspiracy involving money laundering and aiding and

21  abetting, and asserted forfeiture allegations.  Kelley explained that the information that lead to the

22  money laundering conspiracy count was voluminous and required a substantial period of time to review

23  and analyze.  He did not have time to complete this analysis before the first superseding indictment was

24  sought.  Some of this information came from the Cybercrime Unit's forensic analysis, which was not

25  completed until May, the same month that the government sought the first superseding indictment.  The

26  court finds Kelley's testimony credible and that it generally comports with the timeline of events

27  corroborated in the exhibits admitted at the hearing.  Chaiban's allegation that Kelley and/or Kenny

28  obtained information from the Chaiban/Murray calls to seek the first and second superseding

1   indictments is conjecture.  Chaiban has not met his burden of showing that Kelley obtained the

2   information that lead to the second superseding indictment from Chaiban's calls to Murray.  There is

3   ample evidence in the record to support the government's argument that it had multiple independent

4   sources of information for seeking the first and second superseding indictments.  The court finds that

5   Chaiban has not shown the government sought the superseding indictments based on information

6   obtained from his calls to Murray.

7         **2.**      **Chaiban's Claim Kenny Disseminated Copies of Audio Recordings of the**

8               **Chaiban/Murray Calls to Him and Various Members of the Investigation and**

9               **Prosecution Teams, and Instructed Fagerberg to Obtain Discovery from Litman**

10              **with Knowledge That the Discovery Contained Audio Recordings of the Murray**

11              **Calls.**

12  The evidence presented at the evidentiary hearing suggests that Chaiban's second allegation is

13  partially accurate, but that it was not prejudicial.  Kelley testified that Kenny instructed him not to listen

14  to audio recordings of Chaiban/Murray calls after he inadvertently overhead one, and to appoint a taint

15  agent to review the Chaiban/Murray calls.  At that point, Kelley turned over the audio recordings to

16  Hamblin.  Kelley also testified that Kenny instructed him to take the audio recordings and summaries of

17  the audio recordings prepared by Hamblin to Vasquez so he too could review them.  Vasquez

18  conducted this review as the taint attorney.  These were the only two instances when Kenny instructed

19  Kelley to provide the Murray calls to other investigators or AUSAs.  Providing Hamblin and Vasquez

20  with the Chaiban/Murray calls was done to avoid having Kenny or Kelley learn of their contents.

21  Therefore, the dissemination of the Chaiban/Murray calls in this instance was done to avoid causing

22  prejudice to Chaiban by ensuring that those in charge of the investigation and prosecution were not

23  exposed to the contents of the Chaiban/Murray calls.  Accordingly, the court finds that Chaiban was not

24  prejudiced by the distribution of the Chaiban/Murray calls to Hamblin and Vasquez.

25  Additionally, Chaiban claims, without much explanation, that he was prejudiced by Kenny's

26  instruction to Fagerberg that he obtain discovery from Litman, rather than copy the voluminous

27  discovery materials.  Chaiban's motion implies that Kenny knew the Murray calls were within the

28  discovery, and told Fagerberg to seek discovery from Litman to somehow surreptitiously provide

Fagerberg with the Murray calls.  Chaiban claims that the "mere fact alone that the co-defendant and her counsel have this information is prejudicial to the defendant." (Mot. at 28:21-23.)  However, during oral argument, Litman admitted that he gave the discovery to Fagerberg knowing that it contained the Murray calls.  Litman acknowledged he made a conscious decision to disclose the calls to Fagerberg because he was under the impression that "everyone" knew the contents of the Chaiban/Murray calls so there was no harm in providing Fagerberg – and by extension, Graham – the audio recordings. Fagerberg could not remember what discovery materials he reviewed and did not testify he listened to the Murray calls.  Fagerberg testified that he learned of Chaiban's plan to "dump" his client from Kelley, whom he "understood" learned that information from listening to the Chaiban/Murray calls. However, Fagerberg did not articulate any reason for this assumption in either the declaration submitted with Chaiban's motion to dismiss or in his testimony.  The court finds that Chaiban has not shown substantial prejudice as a result of the government's handling of discovery materials which resulted in disclosure of the Chaiban/Murray calls to Fagerberg.

### 3.  Chaiban's Claim the Government Decided to Use Co-defendant Graham as a Witness Against Chaiban after Listening to the Chaiban/Murray Calls.

Contrary to Chaiban's allegation, the evidence indicates that the government sought to use Graham's testimony against Chaiban from the outset of their case against her.  Kelley testified that the first time he discussed Graham's possible cooperation with the government was when he met with her in the parking lot of the Meadows Mall on March 8, 2006, the day Chaiban was arrested.  The second time Graham's cooperation with the government was discussed was around the time of her detention hearing.  Graham made an initial appearance and was arraigned on June 15, 2006.  (See Minutes of Proceedings, #30.)  Mr. Litman appeared on her behalf, she was canvassed concerning a potential conflict of interest with being jointly represented by counsel for Chaiban, the government moved for detention, and she was temporarily detained pending a detention hearing and confirmation of independent counsel.  Graham appeared at the detention hearing with Mr. Litman on June 20, 2006, who indicated she had secured new counsel who would shortly be filing a *pro hac vice* application. (See Minutes, #35.)  Mr. Fagerberg filed his *pro hac vice* application and confirmed as counsel at a hearing conducted June 27, 2006.  (See, Minutes, #40.)

1    Barbara Graham testified that during her second call with Kelley after the detention hearing,

2    Kelley spoke to her about her daughter's possible cooperation.  Barbara Graham also testified that

3    during that second phone call, Kelley told her that he had listened to audio recordings of telephone calls

4    that indicated to him that Chaiban would "dump" Graham at the conclusion of the case.  Kelley did not

5    tell her who was speaking in the calls to which he referred.  Kelly testified that he was referring to the

6    Chaiban/Graham calls.  He admitted that he could not pinpoint a particular call that lead him to such a

7    conclusion; instead, it was the general tone of the conversation.  In addition, he noted the marked

8    similarity between the course of Chaiban's relationship with Graham and his relationships with other

9    women.  Kelley cited information he learned during his investigation about several relationships in

10   which Chaiban had abruptly left the woman involved at the end of his criminal case.  In particular, he

11   noted the similarity to Chaiban's relationship with Hutchinson, which Chaiban terminated upon his

12   release from custody.  Kelley pointed to the numerous letters Chaiban and Hutchinson wrote to one

13   another while Chaiban was in prison as evidence of this similarity.  (See Ex. R.)

14   During oral argument, Chaiban claimed that Kelley learned that Chaiban would end his

15   relationship with Graham when Hamblin talked to Kelley about hearing Murray ask Chaiban "is Lizzie

16   gone gone."  Hamblin asked Kelley who Lizzie was in an exchange on July 31, 2006, following a

17   meeting at the U.S. Attorney's Office.  Counsel for Chaiban suggested Kelley could only have been

18   aware of Chaiban's plans to "dump" Graham either from Hamblin, or from listening to the

19   Chaiban/Murray calls himself.  However, both Kelley and Barbara Graham testified that Kelley told

20   Barbara Graham he believed Chaiban was planning to "dump" her daughter, co-defendant Erin Graham,

21   more than a month earlier, immediately after Erin Graham's detention hearing on June 20, 2006.  (See

22   Minutes, #35.)

23   The evidence clearly demonstrates that the government sought Graham's cooperation from the

24   outset of the case against her, and that Kelley formed his conclusion Chaiban would end his relationship

25   with Graham from his independent investigation, not from listening to the Chaiban/Murray calls.  The

26   court finds that Chaiban has not demonstrated substantial prejudice from the manner in which the

27   government sought Graham's agreement to cooperate and testify at trial.

28   / / /

**4.** **Chaiban's Claim the Government Learned of Chaiban's Ex-girlfriend Lisa Hutchinson and Her Involvement with the Websites Chaiban Was Operating from Listening to the Chaiban/Murray Calls, Located Hutchinson, Conducted an Interview with Her, and Obtained Incriminating Information from Her Laptop.**

The evidence clearly demonstrates that there is no merit to this allegation. Kelley's uncontroverted testimony is that he first met with Hutchinson in December 2005 after Hutchinson approached ICE with information about Chaiban. ICE approached Kelley about conducting a further investigation and provided Kelley with contact information for Hutchinson. Hutchinson showed Kelley the contents of her laptop during his initial meeting with her in December 2005, and in subsequent meetings he had with her on a monthly basis. Kelley did not take the laptop because it was her personal property and because the Cybercrime Unit's backlog prevented it from conducting a forensic analysis. However, he took photographs of her computer screens and text messages he believed had evidentiary value. Officers' reports of the interviews Kelley and other agents conducted of Hutchinson were marked and admitted as Exhibit "P," and corroborate Kelley's testimony. Accordingly, the court finds that Chaiban has not met his burden of demonstrating substantial prejudice resulting from the timing of Kelley's discovery of and meetings with Hutchinson.

**5.** **Chaiban's Claim the Government Sought Forfeiture of Chaiban's Hummer Vehicle and Based the Second Superseding Indictment's Money Laundering Charge Upon Information Learned from Listening to the Chaiban/Murray Calls.**

Chaiban alleges that Kelley learned of his purchase of Hummer vehicle and sought money laundering charges involved in its purchase from listening to the Chaiban/Murray calls. Kelley testified that he learned of the Hummer from surveillance prior to Chaiban's arrest. The record clearly reflects that Kelley applied for and received a seizure warrant for the Hummer, signed March 7, 2006 before Chaiban's arrest. (See Government's Exhibit "Q.") The seizure warrant is supported by Kelley's affidavit which averred he knew that Chaiban and Graham were operating a prostitution business and had no legitimate sources of income. Kelley, therefore, believed that the Hummer was purchased with proceeds of their criminal activity. Additionally, Kelley discovered a bill of sale for the Hummer during the execution of the search warrant on Chaiban's residence on March 8, 2006.

1    Kelley testified that the money laundering charge was not included in either the original

2    indictment or the first superseding indictment because that charge required the Cybercrime Unit's

3    forensic analysis of Hutchinson's laptop, which was not completed until May 2006.  In addition, Kelley

4    explained that the voluminous evidence supporting the money laundering count required a substantial

5    period of time to analyze.  This analysis was not completed at the time the prosecutors went to the

6    grand jury to seek the original or first superseding indictment.  The court finds Kelley's testimony

7    credible and that he had an independent source of information for the forfeiture of the Hummer and

8    money laundering charge.  The court finds that Chaiban has not met his burden of demonstrating

9    substantial prejudice with respect to this claim.

10       **6.    Chaiban's Claim the Government Used Information Learned from the**

11            **Chaiban/Murray Calls to Correct Problems in the First Superseding Indictment**

12            **Regarding the Statute of Limitations.**

13       The government established Litman sent Kenny an e-mail on August 4, 2006 in which Litman

14   made a lengthy argument about the statute of limitations and 42 U.S.C. § 1028A.  The government

15   attached a copy of the e-mail to its Response (#59) as Exhibit "F."  The government did not obtain a

16   second superseding indictment correcting the statute of limitations problem until August 16, 2006,

17   almost two weeks after Litman sent this e-mail.  In addition, Schiess testified that he was not able to

18   review the first superseding indictment as is his usual practice as Kenny's supervisor, because he was in

19   the midst of a  trial at the time Kenny was drafting it.  When the trial concluded and he had an

20   opportunity to review the first superseding indictment, he recognized and raised the statute of

21   limitations issue with her.  The court finds that Chaiban has not demonstrated he was substantially

22   prejudiced by the government's interference with his relationship with counsel in correcting an error in

23   the first superseding indictment.

24       **7.    Defense Strategy**

25       Chaiban's motion to dismiss alleges that defense strategy was discussed in thirty-five of the

26   forty-seven calls Chaiban made to Murray which Kelley obtained from CCDC and NLVDC.  Chaiban

27   believes the government developed its theories of prosecution as a direct result of listening to his calls

28   with Murray.  Relying on the Supreme Court's decision in Weatherford v. Bursey, 429 U.S. 545 (1977),

39

1  and the Ninth Circuit's decision in United States v. Danielson, 325 F.3d 1054 (9th Cir. 2003), he argues

2  that dismissal is the only appropriate remedy for the government's violation of his Sixth Amendment

3  rights to communicate confidentially with counsel.

4      In Weatherford, the Supreme Court held the defendant's Sixth Amendment rights were not

5  violated where no tainted evidence was admitted at trial, and no communication of defense strategy to

6  the prosecution was made.  There, Weatherford, an undercover officer, vandalized a government office

7  with Bursey and two others.  Weatherford tipped local police about the incident and was arrested along

8  with his co-defendants to maintain his undercover status.  He was released on bond and retained

9  counsel to maintain his undercover status.  On two occasions after his release and prior to trial, the

10 undercover officer was invited to meet with Bursey and his counsel.  At the meetings, Bursey and

11 Bursey's attorney sought information, ideas, and suggestions regarding a common defense.  During

12 meetings between Bursey and his lawyer, and Weatherford and his lawyer, Bursey and his lawyer

13 suggested an informer might be used to prove a case against them.  Although Weatherford participated

14 in the meetings, maintaining the masquerade he was a co-defendant, he did not reveal anything that was

15 discussed to his superiors, to the prosecuting attorney, or to any of the prosecuting attorneys' staff.  No

16 information regarding Bursey's trial plans, strategy, or anything having to do with the criminal action

17 pending against Bursey was communicated.  Up until the day of trial, the prosecuting attorney did not

18 plan to use Weatherford as a witness.  However, because Weatherford's effectiveness as an undercover

19 officer had been compromised in the weeks preceding the trial, on the first day of the trial the

20 prosecutor decided to call Weatherford as a witness.  Weatherford testified regarding his undercover

21 activities and gave an eyewitness account of the crime.

22     After his trial, conviction, and incarceration, Bursey filed a § 1983 action alleging that

23 Weatherford had communicated his defense strategies and plans and violated his Sixth and Fourteenth

24 Amendment rights.  The Supreme Court reversed the Fourth Circuit Court of Appeals which found that

25 Bursey's right to effective assistance of counsel and a fair trial had been violated.  The Supreme Court

26 rejected Bursey's argument that Weatherford's presence at a meeting with his counsel in which

27 common defense strategy issues were discussed was a *per se* violation of Bursey's Sixth Amendment

28 rights.  Relying on the trial court's finding that Weatherford had not communicated anything about the

40

1    two meetings he attended to anyone else, the Supreme Court found Bursey's Sixth Amendment rights

2    had not been violated.

3          In Danielson, the Ninth Circuit found that the prosecution team took deliberate and affirmative

4    steps while Danielson was represented by counsel that resulted in the prosecution team obtaining

5    privileged information about Danielson's trial strategy.  After Danielson was indicted, an informant

6    contacted the Oregon State Police, indicating that Danielson had spoken with the informant and might

7    want him to testify to something he did not see.  With the encouragement of the prosecuting AUSA, the

8    investigating state police officer encouraged the informant to continue his conversations with

9    Danielson.  The informant tape recorded a telephone conversation with Danielson, and thereafter wore a

10   body wire and recorded a lengthy conversation with Danielson in which the informant actively elicited

11   and discussed Danielson's trial strategy at length.  The investigating state law enforcement officer

12   received this privileged trial strategy, and sent memoranda to the prosecuting AUSA.

13         The AUSA received memoranda and transcripts of the meetings between the informant and

14   Danielson, kept them in a file cabinet, and submitted an affidavit stating that he and the police were

15   seeking to use the informant to gather evidence of new crimes against Danielson such as subornation of

16   perjury and bribery rather than to obtain information about Danielson's trial strategy.  However, during

17   oral argument in the Court of Appeals, the AUSA asserted, for the first time, that he had reviewed

18   redacted transcripts of the informant's conversation with Danielson.  The Ninth Circuit found the

19   government's use of the informant to obtain information from Danielson regarding separate offenses for

20   which he had not been indicted, "such as jury tampering and suborning perjury, was not an

21   impermissible intrusion into the attorney-client privilege and, therefore, did not violate his Sixth

22   Amendment rights."  325 F.3d at 1066.  However, the Ninth Circuit found the government went too far

23   in subsequently and deliberately eliciting incriminating statements and trial strategy from Danielson

24   which was improper under the Sixth Amendment.  Because the government obtained information about

25   Danielson's trial strategy, the Ninth Circuit remanded the case to the trial court to determine whether

26   Danielson was prejudiced by the prosecution's knowledge of his trial strategy.  In doing so, the Ninth

27   Circuit adopted the two-step burden shifting analysis described *supra*.

28   / / /

1    The Danielson decision recognized the legitimate government interest in investigating

2  independent crimes contemplated or perpetrated by an indicted defendant, and endorsed use of an

3  insulation or "firewall" procedure to shield case agents and the prosecutors from attorney-client

4  conversations.  Finding that Danielson had shown: (1) that the government deliberately sent an

5  informant to obtain information from Danielson; (2) that the informant actively elicited privileged trial

6  strategy from Danielson; (3) that the informant told privileged information to members of the

7  prosecution team; (4) that a member of the prosecution team wrote a memorandum about this

8  information; (5) that members of the prosecution team listened to and transcribed transcripts containing

9  the information; and (6) that the prosecutor in charge of the case kept much of the information in his

10  private office; the Ninth Circuit found that Danielson had shown enough to shift the burden to the

11  government to show that it did not use any of this information.  The case was, therefore, remanded for

12  an evidentiary hearing for the government to "show that all of the evidence it introduced at trial was

13  derived from independent sources, and that all of its pre-trial and trial strategy was based on

14  independent sources."  Id. at 1074.

15    Applying these principles, the court finds that Chaiban has not established that the government

16  acted affirmatively to intrude into the attorney-client relationship to obtain his trial strategy.  While it is

17  undisputed that Kelley intentionally obtained Chaiban's jail telephone calls, he did so for a legitimate

18  law enforcement purpose to investigate Chaiban's conduct, whether he was using Graham to destroy

19  evidence or silence potential witnesses, and to determine whether Murray was a possible co-

20  conspirator.  He obtained the phone numbers he requested from both detention centers based on

21  information learned during his investigation.  The court found Kelley credible that when he obtained the

22  first set of Chaiban's telephone conversations from CCDC and listened to a single call between

23  Chaiban and Murray, he was not aware that Chaiban was speaking to Murray.  The court also found

24  Detective Kelley credible that it was not until he obtained the response from an administrative subpoena

25  served on the phone company for subscriber information that he learned one of the calls he listened to

26  was placed to Murray.  Once Kelley learned that he had listened to a single call between Chaiban and

27  Murray, he immediately advised Kenny and asked her advice on how to proceed.  Although both Kelley

28  and Kenny believed that Chaiban's calls to Murray were not privileged for various reasons, Kenny

1  advised Kelley to assign a taint agent to review the Chaiban/Murray calls out of an abundance of

2  caution.

3       Chaiban suggests that despite the assignment of Hamblin to act as a taint agent, and later AUSA

4  Vasquez to act as the taint attorney, Kelley, Kenny and Schiess have either listened to the

5  Chaiban/Murray calls, or learned of their contents.  The record does not support Chaiban's speculation.

6  Based on the evidence adduced during the evidentiary hearings the court conducted, the court finds that

7  neither Kenny nor Schiess listened to or learned of the contents of the Chaiban/Murray calls.

8       In making this finding, the court does not endorse the taint procedure the government employed

9  in this case.  Kelley's role in gathering and delivering the discovery to the U.S. Attorney's Office

10 resulted in his handling of the CDs containing the Chaiban/Murray calls and Hamblin's summaries of

11 those calls.  Kelley was also responsible for obtaining and providing these materials to Vasquez.  The

12 CDs and summaries were placed in a box with other discovery materials and provided to Ms. Kenny's

13 assistant for bate stamping and delivery to counsel for the defendants.  Neither the CDs, nor the

14 summaries Hamblin prepared were segregated or sealed.  However, while the procedures followed may

15 have been less than ideal, the court is persuaded that the two U.S. attorneys prosecuting this case were

16 insulated from and were not privy to the contents of the Chaiban/Murray calls.  The court, therefore,

17 finds that Chaiban has not made a *prima facie* showing that the government affirmatively intruded into

18 the attorney-client relationship.  Moreover, even if Chaiban could make a *prima facie* showing of

19 affirmative intrusion into the attorney-client relationship, the government has demonstrated, by a

20 preponderance of the evidence, that this prosecution is based on information independently derived

21 from the Murray/Chaiban calls.

22      As discussed, *supra*, Kelley conducted an extensive investigation of Chaiban's prostitution

23 business prior to seeking the first indictment.  On March 8, 2006, following execution of a search

24 warrant at Chaiban's residence and Chaiban's arrest, Kelley and other investigators interviewed

25 Markham, Hutchinson, and Pangellian; Kelley viewed all of the websites which were linked to Chaiban

26 through phone records; Kelley and other law enforcement officers had conducted surveillance on the

27 Hummer; Kelley had viewed the content of Hutchinson's laptop; and Kelley and other law enforcement

28 officers had conducted undercover operations of Chaiban's prostitutes.  The search of Chaiban's

residence pursuant to the state search warrant uncovered further evidence of Chaiban's activities, and Kelley recovered evidence during the execution of that search warrant which lead him to suspect Murray was a possible co-conspirator in Chaiban's illegal activities.  Specifically, Kelley discovered Murray's credit card had been used to pay for Chaiban's websites and her bank statement was found in Chaiban's residence.  The court has found that the delay in seeking the first and second superseding indictments was based on the nature of the ongoing investigation, and need to image and analyze information from Hutchinson's computer and analyze information received from other sources.  In short, the court finds that the government has not used any information from the Chaiban/Murray calls to prosecute Chaiban.

Finally, even if Chaiban had established that improper governmental intrusion violated his Sixth Amendment rights, and substantial prejudice, the drastic remedy of dismissal is not required.  Even in cases in which courts have found the government has deliberately elicited incriminating statements from an indicted defendant in the absence of counsel, the remedy has been to exclude the government from using such statements in its case-in-chief.  See, Michigan v. Harvey, 494 U.S. 344, 349-53 (1990).  Improperly elicited statements from an indicted defendant in the absence of counsel, while excluded from the government's case-in-chief, are nevertheless admissible to impeach conflicting testimony by a defendant provided the statements were voluntarily made.  Id.  Thus, even if Chaiban had established substantial prejudice for violation of his Sixth Amendment rights by the prosecutors' intentional intrusion into his attorney-client relationship, exclusion of tainted evidence in the government's case-in-chief, not dismissal of the indictment, would not be the appropriate remedy.

**III.    Title III of the Omnibus Control and Safe Streets Act of 1968, 18 U.S.C. § 2510**

Chaiban argues that interception and recording his jail phone conversations violates the provisions of Title III.  However, the Ninth Circuit has followed the other circuits which have decided the issue and held concluding audio taping does not violate Title III that two exceptions to Title III apply to interceptions and recordings of jail calls.  The first exception is the so-called "law enforcement exception" codified at 18 U.S.C. § 2510(5)(a) which excludes calls intercepted and recorded by an investigative or law enforcement officer in the ordinary course of his duties.  United States v. Van Poyck, 77 F.3d 285, 292-93.  The Ninth Circuit has also found that the consent exception, codified at

44

1  18 U.S.C. § 2511(2)(c), applies to intercepted outbound inmate calls because consent may be express or

2  implied, in fact, from the surrounding circumstances.  Id.  Interception recording Chaiban's jail phone

3  conversations did not violate the provisions of Title III.

**CONCLUSION**

5       Having reviewed and carefully considered all of the moving and responsive papers, the

6  testimony adduced during the evidentiary hearings conducted, the declarations and exhibits introduced,

7  and for the reasons stated,

8       **IT IS RECOMMENDED** that defendant Fadi Chaiban's Motion to Dismiss Indictment Based

9  on the Violation of the Sixth Amendment (#56) be DENIED.

10      **IT IS ORDERED:**

11          1.    The government's Motion to Withdraw the Motion for Evidentiary Ruling (#73)

12                is GRANTED.

13          2.    The government's Motion for Evidentiary Ruling (#70) is deemed

14                WITHDRAWN, and DENIED as moot.

15      Dated this 1st day of February, 2007.

17                                           _____

18                                           PEGGY A. LEEN
                                             UNITED STATES MAGISTRATE JUDGE

45